# Funding for the Critical Technologies Institute

The Department of Defense may make funds available to the National Science Foundation out of monies appropriated in the Department of Defense Appropriations Act, 1991, to support the activities of the Critical Technologies Institute during the 1992 fiscal year.

May 12, 1992

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
OFFICE OF MANAGEMENT AND BUDGET

This responds to your request for our opinion whether the Department of Defense ("DoD") may make $5 million available to the Director of the National Science Foundation ("NSF") out of monies appropriated in the Department of Defense Appropriations Act, 1991, Pub. L. No. 101-511, tit. IV, 104 Stat. 1856, 1870 (1990) ("FY 91 Appropriations Act"). The funds would be used to support the activities of the Critical Technologies Institute ("the Institute") during the current fiscal year. Although you have concluded that DoD may make those monies available for this purpose,[1] DoD disagrees.[2] We conclude that DoD may take those monies available for funding the activities of the Institute.

## I.

Congress established the Institute in the National Defense Authorization Act for Fiscal Year 1991, Pub. L. No. 101-510, § 822, 104 Stat. 1485, 1598 (1990) ("FY 91 Authorization Act") (codified as amended at 42 U.S.C. § 6686). The Institute is "a federally funded research and development center," 42 U.S.C. § 6686(a), with a variety of duties, including the assembly and analysis of information "regarding significant developments and trends in technology research and development in the United States and abroad," and the provision of technical support and assistance to presidential science and

---

[1] *See* Memorandum for Timothy E. Flanigan, Acting Assistant Attorney General, Office of Legal Counsel, from Robert G. Damus, Acting General Counsel, Office of Management and Budget ("OMB") (Apr. 23, 1992) ("OMB Memorandum").

[2] *See* Memorandum for Douglas R. Cox, Deputy Assistant Attorney General, Office of Legal Counsel, from Manuel Briskin, Deputy General Counsel (Fiscal & Inspector General), DoD (Apr. 21, 1992) ("DoD Memorandum").

technology advisers. *Id.* § 6686(d)(1) and (4)(A). Although Congress initially provided that the Office of Science and Technology Policy ("OSTP") would serve as the Institute's sponsoring agency, *see* FY 91 Authorization Act, § 822(e)(1), 104 Stat. at 1599, a 1991 amendment provided that the Institute would operate under a sponsorship agreement with NSF. *See* National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub. L. No. 102-190, § 822(c), 105 Stat. 1290, 1435 (1991) ("FY 92 Authorization Act") (codified at 42 U.S.C. § 6686(g)). NSF is an independent entity in the executive branch whose responsibilities include supporting scientific and engineering research, maintaining a "clearinghouse for the collection, interpretation, and analysis of data on scientific and engineering resources," and providing a source of information for policy formulation by the Federal Government. 42 U.S.C. §§ 1861, 1862(a).

In the FY 91 Authorization Act, Congress authorized $5 million, out of DoD funds, for the Institute's activities during its first fiscal year of operation. FY 91 Authorization Act, § 822(g)(1), 104 Stat. at 1600.[3] In the FY 91 Appropriations Act, Congress appropriated a lump-sum of more than $9.1 billion for DoD research and development activities; those monies were made available through fiscal year 1992. FY 91 Appropriations Act, tit. IV, 104 Stat. at 1870.[4] The FY 91 Appropriations Act did not specifically refer to the Institute as one of the activities or projects covered by the lump-sum appropriation.

The Institute did not begin operations in fiscal year 1991 and, as a result, no funds were obligated for its activities during that fiscal year. OMB Memorandum at 5. Nonetheless, in the DoD appropriations act for fiscal year 1992, Congress assigned new responsibilities to the Institute. *See* Department of Defense Appropriations Act, 1992, Pub. L. No. 102-172, § 8112, 105 Stat. 1150, 1201 (1991) ("FY 92 Appropriations Act"). Shortly thereafter, Congress amended the Institute's authorizing legislation. *See* FY 92 Authorization Act, § 822, 105 Stat. at 1433. The FY 92 Authorization Act altered the Institute's structure and revised its duties somewhat, and also amended its funding authorization. The amended funding provision, at the center of OMB's dispute with DoD, reads as follows:

> To the extent provided in appropriations Acts, the Secretary of
> Defense shall make available to the Director of the National

---

[3] Section 822(g)(1) provided: "Subject to such limitations as may be provided in appropriation Acts, the Secretary of Defense shall make available to the Director of the Office of Science and Technology Policy, out of funds available for the Department of Defense, $5,000,000 for funding the activities of the Institute in the first fiscal year in which the Institute begins operations."

[4] Congress appropriated "[f]or expenses of activities and agencies of the Department of Defense (other than the military departments), necessary for basic and applied scientific research, development, test and evaluation; advanced research projects as may be designated and determined by the Secretary of Defense, pursuant to law; maintenance, rehabilitation, lease, and operation of facilities and equipment, as authorized by law; $9,115,699,000, to remain available for obligation until September 30, 1992." 104 Stat. at 1870.

Science Foundation, out of funds appropriated for fiscal year 1991, $5,000,000 for funding the activities of the Institute.

*Id.* § 822(d)(1), 105 Stat. at 1435. The FY 92 Authorization Act also authorized the transfer of funds previously "appropriated to any department or agency for" the Institute to NSF for purposes of carrying out the Institute's activities. *Id.* § 822(d)(3), 105 Stat. at 1435.[5]

## II.

You ask whether DoD may make available to NSF, out of monies appropriated by the FY 91 Appropriations Act, $5 million for funding the operations of the Institute during the current fiscal year. OMB and DoD agree that the Institute, a "research and development center" with wide-ranging responsibility for collecting and analyzing science and technology data, 42 U.S.C. § 6686(a), (d), qualifies as a proper research and development activity for purposes of the FY 91 Appropriations Act. OMB and DoD further agree that $5 million of DoD's FY 91 appropriations was available to fund the Institute prior to enactment of the FY 92 Authorization Act. OMB Memorandum at 11-13; DoD Memorandum at 2. The sole issue for our resolution, therefore, is whether the FY 92 Authorization Act created a new requirement for a more specific appropriation for the Institute than had been made in the FY 91 Appropriation Act. We believe it did not. Accordingly, we conclude that DoD may make the funds available to NSF.

It is axiomatic that an agency must have legal authority to perform its functions and, if it is to spend public monies, appropriated funds. An agency's legal power typically derives from its "organic" or "enabling" statute. I U.S. General Accounting Office, *Principles of Federal Appropriations Law* 2-33 (2d ed. 1991) (*"Principles 2d"*). Its appropriated funds of course must have been drawn from the Treasury pursuant to a duly enacted statute in accordance with Article I, Section 9 of the Constitution, which provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

In addition to legislation appropriating monies, Congress frequently enacts budget "authorization" legislation, which, as the name implies, authorizes Congress to appropriate monies for described purposes. *Principles 2d* at 2-33. "An authorization act is basically a directive to the Congress itself which Congress is free to follow or alter (up or down) in the subsequent appropriation act." *Id.* at 2-35. Congress usually passes authorization legislation before enacting appropriations legislation, but sometimes the order is reversed. *Id.* at 2-48.

---

[5] In the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1992, Congress had appropriated roughly $6,000,000 for necessary expenses of OSTP. Pub. L. No. 102-139, tit. III, 105 Stat. 736, 766 (1991). The legislative history of this act suggests that Congress intended roughly $1.6 million in additional funds for the Institute. H.R. Conf. Rep. No. 226, 102d Cong., 1st Sess. 48-49 (1991).

It is also axiomatic that Congress may make a lump-sum appropriation covering a wide range of activities without specifying precisely the objects to which the appropriation may be applied. *See TVA v. Hill*, 437 U.S. 153, 164 n.14 (1978) (noting that TVA projects are funded from lump-sum appropriations "without the need for specific congressional authorization"); *International Union, United Auto., Aerospace & Agric. Implement Workers of America v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("[a] lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit") (footnote omitted), *cert. denied*, 474 U.S. 825 (1985). As we advised OMB more than a decade ago, "[i]f the activity or function is one which Congress has elsewhere given the agency authority to perform, its funding does not depend upon its being singled out for specific mention each year in the appropriation progress." Letter for Michael J. Horowitz, Counsel to the Director, OMB, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, at 3-4 (Sept. 18, 1981). A rule requiring greater specificity in appropriations would create extreme obstacles for the functioning of the Federal Government. *See id.* at 4; U.S. General Accounting Office, *Principles of Federal Appropriations Law* 5-94 (1st ed. 1982) (*"Principles 1st"*). As the General Accounting Office has recognized, "as the Federal budget has grown in both size and complexity, a lump-sum approach has become a virtual necessity. . . . [A]n appropriation act for an establishment the size of the Defense Department structured solely on a line-item basis would rival the telephone directory in bulk." *Id.*

Applying these principles here, we conclude that DoD may make the monies in question available to NSF for purposes of funding the Institute during the current fiscal year. In the FY 91 Appropriations Act, Congress appropriated a lump-sum of more than $9.1 billion, available for obligation through fiscal year 1992, for research and development activities by DoD. FY 91 Appropriations Act, tit. IV, 104 Stat. at 1870. *See supra* p. 78. The FY 91 Authorization Act clearly contemplated that DoD could make $5 million of its $9.1 billion research and development appropriation available for the Institute. The act states that the Secretary of Defense "shall make available" the funds in the first fiscal year that the Institute begins its operations. FY 91 Authorization Act, § 822(g)(1), 104 Stat. at 1600. This direction is qualified only with the phrase "[s]ubject to such limitations as may be provided in appropriation Acts." *Id.* The FY 91 Appropriations Act did not mention the Institute and contained no applicable limitations. Therefore, in light of the general principles of appropriation law discussed above, the $5 million was available for the Institute.

The legislative history, although not controlling, supports this understanding of the FY 91 statutes. *See* Statement on Signing the Department of Defense Appropriations Act, 1991, II Pub. Papers of George Bush 1558 (1990) (distinguishing between an unenacted annex to the conference report and the law itself). A table in the conference report accompanying the FY 91

Appropriations Act demonstrates that the conferees envisioned that DoD would expend $5 million of the $9.1 billion lump-sum appropriation for research and development on the Institute. *See* H.R. Conf. Rep. No. 938, 101st Cong., 2d Sess. 116 (1990). The report prepared by the Senate Committee on Appropriations demonstrates the same understanding. *See* S. Rep. No. 521, 101st Cong., 2d Sess. 235 (1990) ("[a]s approved by the full Senate, the Committee adds $5,000,000 to the budget for" the Institute).[6]

Although OMB and DoD do not dispute that the FY 91 Authorization Act, which authorized appropriation of funds for the Institute "[s]ubject to such limitations as may be provided in appropriation Acts," FY 91 Authorization Act, § 822(g)(1), 104 Stat. at 1600, authorized appropriation of the funds for the Institute despite the lack of a specific line-item appropriation, DoD contends that amendments made by the FY 92 Authorization Act now prohibit it from making those monies available to NSF. DoD Memorandum at 1-2. Among other changes, the FY 92 Authorization Act changed the introductory phrase of the funding provision to read: "[t]o the extent provided in appropriations Acts." FY 92 Authorization Act, § 822(d)(1), 105 Stat. at 1150, 1435, *quoted supra* pp. 78-79. DoD argues that phrase requires a specific appropriation for the Institute. As a consequence, DoD concludes that neither the lump-sum appropriation for research and development activities in the FY 91 Appropriations Act, nor the earmarking table in the 1991 conference committee report, is sufficient to provide DoD with the authority to make the $5 million available to NSF. DoD Memorandum at 2. The FY 92 Appropriations Act makes no specific reference to the Institute.

We disagree with DoD that the text of the FY 92 Authorization Act requires a specific line-item appropriation. The FY 92 Authorization Act authorized $5 million for the Institute "[t]o the extent provided in appropriations Acts." Although to "provide" may mean, as DoD apparently interprets it, "to make a proviso or stipulation," *Webster's Ninth New Collegiate Dictionary* 948 (1986), it may also mean, more generally, "to make preparation to meet a need." *Id.* The FY 92 Authorization Act authorized the funds "[t]o the extent provided in appropriations Acts," and the FY 91 Appropriations Act, we believe, so "provided" — albeit in general, not specific, terms. As we have explained, it is a fundamental principle of appropriations law,

---

[6] Two events following enactment of the FY 91 statutes are suggestive. In considering the FY 92 Appropriations Act, the Senate adopted language, later deleted without explanation by the conference committee, expressly stating "[t]hat of the funds appropriated for fiscal year 1991 under the heading 'Research, Development, Test and Evaluation, Defense Agencies,' $5,000,000 shall be obligated for the Critical Technologies Institute within 90 days after enactment of [the] Act." 132 Cong. Rec. 13,442 (daily ed. Sept. 23, 1991). *See also* S. Rep. No. 154, 102d Cong., 1st Sess. 337 (1992). In addition, the House Committee on Appropriations is currently considering a proposal to rescind, from monies made available under the FY 91 Appropriations Act $4.9 million from the Institute's funding. House Comm. on Appropriations, 102d Cong., 2d Sess. (Comm. Print 1992). Both suggest a clear understanding on the part of Congress that the $5 million had been appropriated for the Institute, although we accord this "subsequent legislative history" minimal weight. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U S. 102, 118 n.13 (1980); *Sullivan v. Finkelstein*, 496 U.S. 617, 631-32 (1990) (Scalia, J., concurring in part).

repeatedly enunciated by the Comptroller General, that Congress is not required to enact a specific appropriation for a program. *See Principles 1st* at 5-94 to 5-103 (citing opinions). A lump-sum appropriation covering the general category is sufficient. *See supra* p. 80. There is nothing in the text of section 822(d)(1) that alters this principle.[7]

Such an interpretation does not, as DoD claims, render the introductory clause of section 822(d)(1) a nullity. First, the statute would not have "exactly the same meaning" with or without the introductory clause. *Cf.* DOD Memorandum at 3. The introductory clause makes clear that the act merely authorizes funds, and that a further appropriation is required. This reading is thus consistent with the distinction between authorization and appropriation legislation. *See supra* p. 79. Second, such an interpretation does not render "meaningless" the change in the introductory clause from the FY 91 Authorization Act to the FY 92 Authorization Act. *Cf.* DoD Memorandum at 3. DoD is correct that section 822(d)(1), referring as it did to the 1991 appropriation, did not contemplate a future or concurrent appropriation. It is for just this reason, however, that the change in locution makes sense. The FY 91 Authorization Act was considered in Congress at the same time as the FY 91 Appropriations Act, and both passed Congress on the same day. Therefore, when Congress made the authorization "[s]ubject to such limitations as may be provided in appropriation Acts," it was unclear whether any such limitations would be imposed. By contrast, section 822(d)(1) in the FY 92 Authorization Act specifically referred back to the previous year's appropriations. Hence in passing the FY 92 Authorization Act, Congress knew that the relevant appropriations act, *i.e.*, the FY 91 Appropriations Act, contained no "such limitations." Therefore, although it made sense to condition the authorization in the fall of 1990 on "such limitations," not knowing whether there would be any, it would have been illogical to repeat the phrase in the amended authorization in the fall of 1991. The substituted language reflects this fact.

By contrast, DoD's interpretation of the introductory clause would render *all* of section 822(d)(1) a nullity. The appropriation for fiscal year 1991, the only appropriation to which section 822(d)(1) refers, had been enacted nearly a year before the FY 92 Authorization Act, and without a specific reference to the Institute. As a consequence, DoD's insistence on a specific appropriation would eliminate the availability of the funds altogether: section 822(d)(1) would command the Secretary of Defense to make available funds that the section, by its terms, simultaneously would render unavailable. Under DoD's interpretation, Congress would have enacted an internally inconsistent provision with no operative effect. Of course, it is fundamental that a statute

---

[7] DoD suggests that had Congress meant "within the amounts provided in an appropriation Act," it could have said so. DoD Memorandum at 2. However, Congress could have just as easily stated "to the extent *specified* in appropriations Acts" or even more simply achieved the result that DoD argues it intended -- prohibiting the use of the 1991 appropriation for the Institute — by doing so expressly. *See* OMB Memorandum at 16.

must be construed, if possible, so that no part of it is made inoperative or superfluous. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955); 2A Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 46.06 (5th ed. 1992).

Further, DoD suggests that the "[t]o the extent provided" clause eliminated the funds that DoD concedes were available under the FY 91 Acts, relying on Comptroller General and Office of Legal Counsel opinions that concern a similar phrase in section 207 of the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 note.[8] DoD suggests that those opinions support the contention that the phrase "[t]o the extent provided in appropriations Acts" requires a specific appropriation for the Institute. DoD Memorandum at 3.

That supposition is rebutted by the opinions themselves. First, the text of section 207 of EAJA presents a significantly different question of interpretation than the provision at issue here. Section 207 states that payment of certain judgments is authorized "only to the extent and in such amounts as are provided in advance in appropriation Acts." The limiting clause in section 207 does not read, as the present statute does, "to the extent provided in" appropriations acts, but rather "to the extent *and in such amounts* as are provided . . . in appropriations Acts." (Emphasis supplied). That additional phrase certainly requires a greater degree of precision than "to the extent provided" would alone, so that even if section 207 requires a specific line-item appropriation, the provision at issue here would not necessarily require the same.

Second, the "to the extent . . . provided" clause in section 207 of EAJA does not, as interpreted in the cited opinions and others, require a specific line-item appropriation. As those opinions explain, the concern motivating section 207's clause was not whether a line-item appropriation rather than a lump-sum appropriation was required, but instead whether an appropriation was necessary at all. Section 207 was prompted by an effort on the House floor to have the EAJA bill ruled out of order because it contained appropriations, in violation of House rules. Section 207, and especially its "to the extent . . . provided" language, was added to make clear that the bill merely authorized funds, but did not appropriate them. Therefore, funds previously appropriated to pay certain judgments could not be utilized to pay other fees and judgments for which appropriations were authorized by the bill without "additional congressional action in the form of legislation." Olson Memorandum, 6 Op. O.L.C. at 209.[9] The Comptroller General reached essentially the same conclusion.[10] *See* 62 Comp. Gen. at 698; 63 Comp. Gen. at 263.

[8] *See* DoD Memorandum at 3 (citing 63 Comp. Gen. 260 (1984); 62 Comp. Gen. 692 (1983); and *Payment of Attorney Fee Awards Against the United States Under 28 U.S.C. § 2412(b)*, 7 Op. O.L.C. 180 (1983). *See also Funding of Attorney Fee Awards Under the Equal Access to Justice Act*, 6 Op. O.L.C. 204 (1982) ("Olson Memorandum").

[9] Although the Olson Memorandum did suggest that a specific appropriation or an amendment of section 207 would be sufficient, 6 Op. O.L.C. at 209 n.10, it did not state that such actions were the

Continued

DoD also cites an unpublished decision of the Comptroller General suggesting that statutory language authorizing payments "'to the extent provided in appropriations acts'" in another statute requires a "specific reference to the payments in an appropriation act." Memorandum from the Comptroller General to the Honorable Edolphus Towns, U.S. House of Representatives, No. B-230775, 1988 WL 227669 at 1 (C.G. 1988).[11] This decision seems inconsistent with the principles discussed in other GAO publications, *see supra* p. 79, the Comptroller General opinions concerning EAJA, discussed above, and other Comptroller General decisions. *See, e.g.,* Matter of Department of Transportation — Allocation of Lump-Sum Appropriation for Pipeline Safety Programs, No. B-222853, 1987 WL 102908 (C.G. 1987). The decision cited by DoD may be explained by a rather strong indication in the legislative history of the act at issue in that decision that Congress had intended to exclude the funds in question from the applicable lump-sum appropriation. In any event, as noted above, *see supra* note 10, we are not bound by decisions of the Comptroller General.

## CONCLUSION

We conclude that pursuant to the statutory authorities DoD may make $5 million of monies appropriated to DoD by the FY 91 Appropriations Act available for funding the activities of the Institute during the current fiscal year.

DOUGLAS R. COX
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[9](....continued)
exclusive means to accomplish that purpose, nor was it addressed to that issue.

[10]Decisions of the Comptroller General, an agent of Congress, are of course not binding on the executive branch. *See* Memorandum for Donald B. Ayer, Deputy Attorney General, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Department of Energy Request to Use the Judgment Fund for Settlement of Fernald Litigation* at 8 (Dec. 18, 1989). Such opinions are often instructive, however, on issues of appropriations law.

[11]DoD cites this unpublished decision in support of what DoD asserts is its consistent practice of interpreting the phrase "to the extent provided in an appropriation act" to require a specific appropriation. We do not here address whether such an interpretation would be correct in other circumstances, for example in the absence of authorization and a previous appropriation made for the same purpose. Obviously, the phrase must be read in context. *See, e.g., McCarthy v. Bronson,* 500 U.S. 136, 139 (1991) ("[S]tatutory language must always be read in its proper context. 'In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.' *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988)."). In any event, we address today only the specific questions posed by the Institute legislation.